### J. H. HAMLEN & SONS CO. v. ILLINOIS CENT. R. CO.

(District Court, E. D. Arkansas, W. D. April 14, 1914.)

#### No. 5691.

1. CARRIERS (§ 35*)—CONTRACTS FOR TRANSPORTATION—VALIDITY.

A carrier, which had never published or filed with the Interstate Commerce Commission a through rate to a foreign port, was neither required nor could it make a through rate to such port without violating Hepburn Act June 29, 1906, § 2, c. 3591, 34 Stat. 586 (U. S. Comp. St. Supp. 1911, p. 1289), amending Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3156), requiring carriers to file schedules of all rates between points on their own routes and points on the route of any other carrier by railroad, pipe line, or water.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. § 35.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CARRIERS (§ 177*)—TRANSPORTATION OF GOODS—LIABILITY FOR CONNECTING CARRIER'S DEFAULT.

A carrier, issuing bills of lading expressly providing that it issued them on its own behalf over its own lines only, and as agent for connecting lines without a joint, but several, liability, was not liable thereunder for the failure of a connecting ocean carrier to accept the shipment for transportation to a foreign country; the Carmack amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 593 [U. S. Comp. St. Supp. 1911, p. 1307]) not applying to foreign commerce.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. § 177.*]

3. CARRIERS (§ 35*)—CONTRACTS—ULTRA VIRES CONTRACT.

A railroad company, not authorized expressly or impliedly by its charter to guarantee the performance of duties by another carrier, had no power to, guarantee the transportation of a shipment by a connecting steamship company at a specified rate, and hence was not liable for the steamship company's failure because of bankruptcy to receive the shipment necessitating its shipment over another line at a higher rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. § 35.*]

4. CARRIERS (§ 35*)—TRANSPORTATION CONTRACTS—VALIDITY—"DISCRIMINATION."

A guaranty by a carrier that a shipment would be transported by a connecting steamship company, over whose line no through rate had been made for a specified rate, was void under the prohibition of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) against "discrimination," since the difference in the rates, if any, would have to be paid out of the earnings of its own line, resulting in a lower rate over its line than that published and charged; any assumption of a more burdensome liability than that specified in the public schedules constituting a "discrimination."

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. § 35.*

For other definitions, see Words and Phrases; vol. 3, p. 2099.]

5. CARRIERS (§ 30*)—CONTRACTS FOR TRANSPORTATION—AUTHORITY OF AGENTS.

A shipper is conclusively presumed to know the published rates of an interstate carrier, and may not rely on the representations of the carrier's agent.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*]

6. CARRIERS (§ 30*)—CONTRACTS FOR TRANSPORTATION—LIABILITY FOR QUOTING LONG RATE.

A carrier is not liable for the damages resulting from its mistake in quoting a rate less than the full published rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*]

At Law. Action by the J. H. Hamlen & Sons Company against the Illinois Central Railroad Company. Judgment for plaintiff for a part only of the amount sued for.

The plaintiff seeks to recover damages sustained by it by reason of a contract entered into between the plaintiff and the defendant, whereby it was agreed that if the plaintiff would make certain shipments from Little Rock, Ark., and Monessen, Pa., over the line of the defendant to New Orleans, La., that road connecting with other roads which have terminals at the initial points of shipments, it would secure and guarantee an ocean rate on freight from New Orleans to Buenos Aires, A. R., at $9.60 per long ton;

that in consideration of this promise the plaintiff had its freight routed over defendant's line to New Orleans, instead of sending it to the port of New York and shipping it to Buenos Aires from that point; that when the freight arrived in New Orleans, there was no steamship line to carry it to Buenos Aires, by reason whereof the plaintiff was obliged to have the freight reshipped to Mobile, Ala., and there engage ocean freight at a higher rate than that guaranteed by the defendant, which sum it seeks to recover by this action.

The answer denied most of the allegations in the complaint, and also pleaded that the railroad company had never filed a schedule of through rates to Buenos Aires with the Interstate Commerce Commission, that its terminal was at New Orleans, and that no tariff rates had been published by it farther than New Orleans. It also denied that it had guaranteed any rate, and alleged that its agent had merely acted as agent for the plaintiff for the purpose of obtaining a rate for it; that it arranged with the Pan-American Steamship Line, which, at that time, ran a line of steamships between the ports of New Orleans and Buenos Aires, to carry plaintiff's freight at the rate alleged, to wit, $9.60 per long ton, and authorized the Chicago, Rock Island & Pacific Railway Company, the initial carrier of the freight shipped from Little Rock, to specify in its bill of lading that rate, and in its own bill of lading which it had issued for the car of freight shipped from Pennsylvania it also inserted the rate of $9.60 per long ton as the ocean rate, but that all bills of lading, those issued by the Chicago, Rock Island & Pacific Railway Company, as well as its own, were what is known as export bills of lading, and in which it was expressly stipulated that in issuing the bill of lading the company only acted as agent for the steamship line or connecting line, and that each line would be liable for any loss or damage caused by it on its own line, and that the responsibility should be several, but not joint.

The case was submitted on an agreed statement of facts, which shows that the agent of the Illinois Central Railroad Company approached the plaintiff and asked for the shipments over its line to New Orleans, and agreed that the railroad company would undertake to get a rate for the ocean freight; that it arranged with the Pan-American Steamship Line, which at that time had steamers plying between the ports of New Orleans and Buenos Aires, to carry the freight at $9.60 per long ton, and so informed the plaintiff; that but for this fact the plaintiff would not have routed its freight over the defendant's line, but would have sent it by way of New York; that the goods were safely carried to New Orleans, and there delivered at the place designated in the bill of lading, the pier of the Pan-American Steamship Line, but when it arrived there the steampship line had become bankrupt and ceased to run its ships; that the defendant immediately notified the plaintiff of that fact, and thereupon the freight was taken to the port of Mobile and there reshipped at a higher rate than had been contracted for with the Pan-American Steamship Line; that for one of the shipments the plaintiff had prepaid to the defendant the ocean freight, amounting to $247.67. It was also agreed that the defendant had never published or filed with the Interstate Commerce Commission a through rate to Buenos Aires.

Rose, Hemingway, Cantrell & Loughborough, of Little Rock, Ark., for plaintiff.

Thos. S. Buzbee, of Little Rock, Ark., for defendant.

TRIEBER, District Judge (after stating the facts as above). **[1, 2]** As the defendant had never published or filed with the Interstate Commerce Commission a through rate to Buenos Aires, it was neither required nor could it make a through rate without violating the Interstate Commerce Law. Southern Railroad Co. v. Reid, 222 U. S. 424, 441, 32 Sup. Ct. 140, 56 L. Ed. 257. The bills of lading expressly provide that the carrier issuing the same only issued them on its own behalf

over its own lines, and- as agent for the connecting lines, without a joint, but several, liability, and as the Carmack amendment applies only to transportation between the states, and not to foreign countries, the defendant is clearly not liable under the bill of lading, even if it had been the initial carrier which had issued the bill of lading, which it was not, except for the car from Pennsylvania.

[3, 4] Is it liable on the contract made before the freight was delivered and the bills of lading issued? Ordinarily the written contract is held to merge all negotiations previously had, but the plaintiff claims that it is entitled to recover on the agreement and guaranty of the defendant, as without it the shipments would not have been made over its lines.

There are two reasons why this contention is untenable:

First. A railroad company has no power, unless expressly, or by necessary implication, authorized by its charter, to guarantee the performance of duties by another carrier, and there is no evidence that the defendant is so authorized. It is true that a carrier may, at common law, lawfully enter into a contract for the carriage of freight over connecting lines by issuing a bill of lading whereby it undertakes absolutely to carry and deliver a shipment to a destination on another line, but there was no such contract here. All that can be claimed is that it is liable on its guaranty to secure the rate of $9.60 per long ton from New Orleans to Buenos Aires. But it had no right to make such a guaranty. That it arranged for the transportation at that rate is admitted, and that is the most it could lawfully agree to do.

The cases relied on by counsel for the plaintiff (Northern Pacific R. R. Co. v. American Trading Co., 195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269, and Southern Pacific Co. v. Interstate Commerce Com., 200 U. S. 536, 26 Sup. Ct. 330, 50 L. Ed. 585), may be distinguished on the facts, but that is unnecessary, as both of these cases arose and were determined by the court prior to the enactment of Hepburn Act June 29, 1906, c. 3591, 34 Stat. 584, 586. Section 2 of that act amends section 6 of the former act so as to read as follows:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation."

It then proceeds to prescribe how the schedules shall be prepared and filed.

As it is not contended that any through rate to Buenos Aires was ever filed by the defendant, it could not indirectly assume a liability which the law prohibits it from assuming directly. The ocean rates were not required to be published, and, for reasons stated in Re Export and Domestic Rates, 8 Interst. Com. Com'n R. 214, 276, Re Tariffs and Export and Import Traffic, 10 Interst. Com. Com'n R.

68, and Armour Packing Co. v. United States, 209 U. S. 78, 28 Sup. Ct. 428, 52 L. Ed. 681, could not properly be made.

Second. If such contracts were permitted, their effect would be to nullify the provisions of the Interstate Commerce Act prohibiting discrimination, for by guaranteeing a lower rate on the foreign line, the difference, if any, would have to be paid out of the earnings of its own line, resulting in a lower rate than that published and charged to other shippers for the carriage of freight over the lines of the railroads, and a lower rate than that specified in its schedules filed with the Commission. Armour Packing Co. v. United States, 209 U. S. 56, 78, 28 Sup. Ct. 428, 52 L. Ed. 681.

Any contract by which a carrier of interstate freight assumes a more burdensome liability than is specified in the published schedules is a violation of the Interstate Commerce Act and void. C. & A. R. R. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033; Clegg v. St. L. & S. F. R. R. Co., 203 Fed. 971, 122 C. C. A. 273; C., C., C. & St. L. R. R. Co. v. Hirsch, 204 Fed. 849, 123 C. C. A. 145. In the Kirby Case it was held that a carrier cannot legally contract with a particular shipper for an unusual service, unless it makes and publishes a rate for such service equally open to all. To guarantee a certain rate from New Orleans to Buenos Aires to one shipper was certainly an unusual service, and not equally open to all, for it had never been published.

[5, 6] Nor is it an excuse that the plaintiff did not know what rates had been published by the railroad company, and that it relied upon the representations of the agent of the company. It has been authoritatively determined that a shipper is conclusively presumed to have that knowledge. K. C. S. Ry. Co. v. Carl, 227 U. S. 639, 653, 33 Sup. Ct. 391, 57 L. Ed. 683. Nor is the carrier liable for damages resulting from a mistake in quoting a rate less than the full published rate. Illinois Cent. R. R. Co. v. Henderson Elevator Co., 226 U. S. 441, 33 Sup. Ct. 176, 57 L. Ed. 290.

There can be no recovery for damages, but the plaintiff is entitled to a judgment for the money prepaid for the ocean freight, amounting to $247.67, with 6 per cent. interest from the time of payment.