**A. L. WOLFE & CO. v. MISSOURI, K. & T. RY. CO. OF TEXAS et al. (No. 9446.)**

(Court of Civil Appeals of Texas. Dallas. Feb. 27, 1926. Rehearing Denied April 17, 1926.)

1. **Carriers ☞24—Transportation Act of 1920 held not to make provisions of Interstate Commerce Act, governing carriers' liability for loss or damage to shipments, applicable to shipments to nonadjacent foreign countries (Interstate Commerce Act, § 1, par. 1, and section 20, par. 11, as amended by Transportation Act 1920, §§ 400, 437 [U. S. Comp. St. Ann. Supp. 1923, §§ 8563, 8604a]).**

In view of history of legislation, Transportation Act 1920, §§ 400, 437 (U. S. Comp. St. Ann. Supp. 1923, §§ 8563, 8604a), amending Interstate Commerce Act, *held* not to broaden provision of Interstate Commerce Act, § 20, par. 11, governing liability of common carriers to shippers for loss or damage to shipments, so as to make it applicable to shipments from United States to nonadjacent foreign countries.

2. **Carriers ☞180(2).**

In absence of contrary statute, provision of bill of lading limiting carriers' liability to its own line is valid.

3. **Carriers ☞180(1).**

Rev. St. 1925, art. 883, prohibiting carriers within the state from limiting their common-law liability, *held* not applicable to shipments to nonadjacent foreign countries.

4. **Carriers ☞177(1)—Statutes governing liability of carriers and connecting carriers held not applicable to shipments to nonadjacent foreign countries (Rev. St. 1925, arts. 905, 906).**

Rev. St. 1925, art. 905, governing liability of connecting carriers respecting shipments "between points in this state," and article 906, authorizing suit against connecting carriers, *held* not applicable to shipments from United States to nonadjacent foreign countries.

5. **Carriers ☞180(1)—Bill of lading provision governing shipment to nonadjacent foreign country, limiting carrier's liability to its own line, and exempting it from liability for fire loss, held valid (Interstate Commerce Act, § 20, par. 11, as amended by Transportation Act 1920, § 437 [U. S. Comp. St. Ann. Supp. 1923, § 8604a]; Rev. St. 1925, arts. 883, 905, 906).**

Provision of bill of lading, governing shipment of cotton from Texas to England, limiting carrier's liability to its own line and exempting it from liability for loss or damage caused by fire, *held* valid at common law, and was therefore binding on all parties; Interstate Commerce Act, § 20, par. 11, as amended by Transportation Act 1920, § 437 (U. S. Comp. St. Ann. Supp. 1923, § 8604a), and Rev. St. 1925, arts. 883, 905, 906, not being applicable.

6. **Carriers ☞185(1) — Where bill of lading contained valid provision exempting carrier from liability for loss or damage by fire, held that burden of proving carrier's negligence on proof of loss by fire was on shipper.**

Where bill of lading, governing shipment to nonadjacent foreign country, contained valid provision exempting carrier from liability for loss by fire, *held* that rights of parties were governed by common law, and, on proof of destruction of shipment by fire, burden of proving negligence was on shipper; there being no presumption of negligence.

7. **Carriers ☞180(4)—Carrier validly limiting its liability to acts of negligence held liable as warehouseman.**

Under bill of lading governing shipment to nonadjacent foreign country validly limiting carrier's liability to its own negligence, *held* that carrier was liable as warehouseman.

8. **Carriers ☞185(3)—Evidence held to show that fire damage to cotton was not due to negligence of railroad or connecting carrier but was sufficient to go to jury on issue of negligence of United States Shipping Board Emergency Fleet Corporation, to whose agents it had been delivered.**

Evidence *held* to show that damage to shipment of cotton by fire while on pier awaiting to be loaded on vessel for transportation to England was not due to negligence of railroad or connecting carrier, but was sufficient to go to jury on issue of negligence of United States Shipping Board Emergency Fleet Corporation, to whose agents it had been delivered.

Error from District Court, Dallas County; T. A. Work, Judge.

Action by A. L. Wolfe & Co. against the Missouri, Kansas & Texas Railway Company of Texas, the United States Shipping Board Emergency Fleet Corporation, and others. Judgment for defendants, and plaintiffs bring error. Affirmed as to defendant first named and certain others, and reversed and remanded as to defendant last named.

Etheridge, McCormick & Bromberg and Paul Carrington, all of Dallas, for plaintiffs in error.

(283 S.W.)

Henry Zweifel, Dist. Atty., of Fort Worth, Edouard Henriques, of New Orleans, La., and Thompson, Knight, Baker & Harris, of Dallas, for defendants in error.

VAUGHAN, J. Sidney E. Wolff and Alvin A. Wolff, copartners in trade under the firm name and style of A. L. Wolfe & Co., plaintiffs in error, brought this suit against defendants in error, Missouri, Kansas & Texas Railway Company of Texas, a corporation, C. E. Schaff, receiver of and for said railway corporation, Galveston Wharf Company, a corporation, and United States Shipping Board Emergency Fleet Corporation, a corporation, alleging that the plaintiffs had delivered to the defendant Schaff, as receiver of said railway company, at Dallas, on or about August 31, 1920, 15 bales of cotton for transportation to Manchester, England, then obtaining a through bill of lading to their order for the carriage by the defendants of such cotton; that the defendants did not safely transport and deliver the cotton as they had each contracted to do as connecting carriers and as agents, respectively, for each other, but, on the contrary, wholly failed so to do, the cotton being destroyed by fire at Galveston, Tex., while in the custody, control, and possession of all the defendants as connecting common carriers and as agents for each other on or about September 30, 1920; that, after such fire, defendants salvaged as much as possible, realizing, however, from the plaintiffs' cotton the sum of only $34.50, which sum they paid to plaintiffs, whereby defendants became liable to plaintiffs for the value of the cotton destroyed less the amount of salvage paid to plaintiffs, but had wholly failed and refused to pay plaintiffs, to their damage in the sum of $3,750.

In this opinion, for the sake of brevity, the word "plaintiffs" refers to plaintiffs in error, and the word "defendants" to defendants in error, and the words "railway company" to the Missouri, Kansas & Texas Railway Company of Texas, and "receiver" to C. E. Schaff, receiver of said railway company, "wharf company" to Galveston Wharf Company, and "Fleet Corporation" to the United States Shipping Board Emergency Fleet Corporation.

In the alternative, plaintiffs alleged that, if the defendants are not otherwise liable, and as to each defendant they should be held not otherwise liable, that the negligence of the defendants, and each of them, was the proximate cause of the destruction of the cotton by fire.

As to the acts of negligence alleged, it will suffice to make the following résumé: That defendants placed plaintiffs' cotton while in due course of shipment on pier No. 35, owned by the wharf company, knowing that such pier was not a reasonably safe place for the retention of such cotton, in that they knew precautions which reasonably should have been taken and equipment which reasonably should have been installed, to protect cotton placed on such pier from loss or damage by fire and to prevent such fire and to minimize the loss therefrom, had neither been taken nor installed; that said pier was wholly of wooden construction, and had, by reason of the long use to which it had been put, become and was highly inflammable; that, adjoining that part of said pier on which plaintiffs' cotton was placed and another section thereof, a large space had been leased to and was then in the possession of the Texas Gulf Sulphur Company, which was then used, and had long been used, by said company for the storage of large quantities of sulphur in two bins, each 600 feet long by 60 feet wide and 6 feet in depth, to be loaded on ships for transportation to other ports, a substance which, as the defendants knew, was and is highly inflammable and subject to be ignited with ease, either at the slightest friction or without friction with internal combustion; that said pier was not properly equipped with adequate hand trucks, electric platform engines, and other equipment for the removal of cotton placed upon such pier in the event of fire; that, notwithstanding defendants knew an unusual wind, amounting to a gale, arose in the afternoon preceding the fire, and so continued for several hours, and that such wind, blowing on the sulphur in said bins, would cause friction in such sulphur sufficient to ignite the same, as the same was in fact ignited during such gale, either from friction or otherwise, and would cause, as it did cause, said pier and all property located thereon, including plaintiffs' property, to be destroyed by fire, the defendants failed to keep proper watch over such sulphur in anticipation of the rising of a fire during the night, and, when such gale was blowing, failed to take proper precaution to avoid and prevent the spread of the fire from such sulphur company's property to plaintiffs' cotton, which failure of the defendants approximately caused plaintiffs' loss and damage.

The defendants, railway company, the receiver, and the wharf company, respectively, answered to the merits, to the effect that the bill of lading constituting the contract of shipment provided that no carrier should be liable for loss or damage to the cotton by fire, that under the federal law, which was applicable rather than state law, such provision was valid, and that plaintiffs could not recover unless they show that negligence of the defendants proximately caused the destruction of the cotton, the burden of proof being upon them in that respect. Each defendant denied that it was negligent in any respect, and that it in any way contributed to the causing of the fire which destroyed the cotton. Each defendant also pleaded the stipulation in the transportation contract that no carrier should be liable for loss or

damage not occurring on its own portion of the through route.

The railway company and the receiver further pleaded a performance of the contract evidenced by bill of lading, by safely transporting said cotton to Galveston, Tex., and there safely delivering same to the wharf company, the connecting carrier, who was to receive said cotton from said defendants for further transportation; and further pleaded that said cotton was destroyed by fire, and that for the damages resulting to plaintiffs from such destruction neither of the defendants are liable under the express terms of said contract of shipment, which provided, among other things, that no carrier or party in possession of all or any of the property therein described shall be liable for any loss thereof, or damage thereto, by causes beyond its control or by flood or by fire, and that no carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route, or after said property is ready for delivery to the next carrier or to consignee; that the loss of said cotton was not due to any negligence on the part of either of said defendants, which was not in the possession of either of them at the time of its destruction, but was in the possession of a connecting carrier.

The wharf company further pleaded that said 15 bales of cotton were received by it from said railway company about September 13, 1920, and by it delivered, on or about September 24, 1920, to Harris Magill & Co., steamship agents, for account of plaintiffs, and were in the possession of said Harris Magill & Co. at the time said cotton was destroyed or damaged by fire, and were not in the possession or under the control of said wharf company, and that said loss and damage did not occur upon its road as, prior to and at said time, it had completely performed its duty in reference to the delivery of said cotton.

The Fleet Corporation, by separate answer, denied that it was under any liability, in that it was only the agent and acting for the United States government for the transportation of the cotton in question, in that the steamship Westshore, which was to transport the cotton under the bill of lading issued therefor, was delivered by the United States government, represented by United States Shipping Board Emergency Fleet Corporation, to Harris Magill & Co., Inc., general agents New York Steamship Agents, on May 30, 1920, pursuant to the operating agreement, form M. O. 3, entered into on March 6, 1920, with said Harris Magill & Co., that said agreement was made directly by the United States government, represented by said Fleet Corporation, with the said Harris Magill & Co., Inc., and that said Fleet Corporation is in no wise connected with or liable for said alleged indebtedness or loss; and

further pleaded that article 4, bill of lading, excepts liability for loss by fire and land damage, and article 13 thereof provides that goods on wharf or awaiting shipment shall be at "shipper's risk" for loss or damage by fire not occasioned by fault or negligence of owner, master, agent, or manager of vessel, and denied that it was in any way or manner at fault, or that it was in any way or manner negligent in the handling of said shipment, and that it was the direct and proximate, or even the remote cause of said fire or loss.

The case was tried to a jury, an instructed verdict being returned in favor of defendants, upon which the judgment appealed from was rendered. Plaintiffs and defendants each presented to the trial court their respective motions for an instructed verdict. The plaintiffs' motion was refused, and the defendants' sustained.

In support of this appeal, plaintiffs urge the following propositions: (a) That plaintiffs were entitled to an instructed verdict; (b) that plaintiffs were entitled, if not to an instructed verdict in their favor, to the submission to the jury of questions whether all or some of the defendants were negligent, and whether such negligence was the proximate cause of the destruction of the plaintiffs' cotton by fire.

The following material facts we find to have been established:

The plaintiffs delivered 15 bales of cotton as alleged, at Dallas, Tex., for carriage to Manchester, England, to defendants Missouri, Kansas & Texas Railway Company of Texas, and C. E. Schaff, as its receiver, and obtained a through bill of lading to their order, which provided for shipment to Manchester by rail to Galveston and by ship of defendant Fleet Corporation to Manchester. That it was a necessary element of such through shipment that the cotton be transferred from the line of the initial carrier to the wharf of the ocean carrier by defendant wharf company. That carriage under the terms of the through bill of lading was undertaken by defendants; the cotton was transported to Galveston, where it was then hauled from the line of the initial carrier to the wharf allotted to defendant Fleet Corporation by the wharf company. That the cotton was unloaded from the cars onto this wharf and placed on the pier, awaiting the arrival of and its removal on board the ship. That a receipt evidencing this fact was executed on behalf of the Fleet Corporation, and delivered to the wharf company several days before the fire. That the delivery of the cotton on pier 35 was between the 17th and 24th days of September, 1920, somewhere between 6 and 13 days before the fire. By its terms the bill of lading provided that:

"(1) No carrier or any party in possession of all or any of the property herein described shall be liable for any loss thereof or damage there-

to by cause beyond its control, or by floods or by fire. * * *

"(2) No carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route, nor after said property is ready for delivery to the next carrier or to consignee.

"(3) No carrier shall be liable for delay nor in any other respect than as warehouseman while the said property awaits further conveyance.

"(4) This contract is executed and accomplished and all liability hereunder terminates on the delivery of the said property to the steamer or master, agent or servants, or to the steamship company or on the steamer pier at the said port."

That the said bill of lading was prepared by plaintiffs and presented to the railway company, at which time plaintiffs stated to the agent of said railway company that they had a contract with Harris Magill & Co., as shipping agents, for the transportation of the cotton by water. That the number, 278, was placed on the bill of lading because that was the number of the contract plaintiffs had with Magill & Co. Before the agent of the railroad company executed the bill of lading, he received confirmation of said contract from Harris Magill & Co. That said railway company transported the cotton from Dallas, Tex., to Galveston, Tex., over its line, and then delivered the car containing said cotton to the wharf company on September 17, 1920, at 6:30 a. m. That pier 35 was the place at which the wharf company was to, and did, deliver said cotton. That said cotton was destroyed by fire while in the possession of the Fleet Corporation on pier 35, the pier occupied by Harris Magill & Co. at that time. That said cotton was unloaded by the wharf company, at which time it obtained from Harris Magill & Co. a receipt. When so placed on pier 35 by said wharf company, Harris Magill & Co. took charge of the cotton as agent of and for said Fleet Corporation, and it remained in its place on said pier, occupied by said steamship agents, from September 24, to September 30, 1920, the date of the fire. At the time of the shipment of this cotton, and until same was destroyed by fire, one H. L. Ziegler was freight broker at Galveston, representing plaintiffs, and he was familiar during all times with the allocation of space on the piers of the wharf company. The fire in question originated in the sulphur in the bins of the Texas Gulf Sulphur Company about 1 o'clock a. m. Approximately 3,000,000 bales of cotton were handled by the wharf company during the season of 1920 over its wharves at Galveston. The sulphur company handled 200 or 300 tons of sulphur in 1920 prior to the time of the fire, and this was the only destructive sulphur fire that had ever occurred. The wharf company did not have anything to do with this cotton after the execution of the receipt by the steamship agent. At the time the fire occurred, the wharf company had a number of freight cars loaded with cotton between the sulphur bins and pier 35. These cars were between the sulphur bins and the cotton in possession of Harris Magill & Co. Those cars caught fire before the cotton on pier 35. That the freight engagement agreement was entered into by plaintiffs with Harris Magill & Co. as operating "for the United States Shipping Board and/or the United States Shipping Board Emergency Fleet Corporation." That Harris Magill & Co. were the disclosed agents of the Fleet Corporation and not of the Shipping Board; said Fleet Corporation being the principal therein.

Bearing on the question of the origin of the fire and the claim of negligence that caused the destruction of plaintiffs' cotton, evidence was introduced establishing the following facts:

John H. McCabe, a night watchman at the sulphur plant, first discovered the fire, and was the only one who was on the premises of the sulphur plant at the time of its discovery. He testified that the boilers used in connection with operating the sulphur plant were built up on conveyors higher than the stored sulphur and removable, so that the conveyors and boilers could be run up and down the entire length of the sulphur bins; that the fuel used in these boilers was oil; that three boilers had been in use during the day prior to the fire, and that, in addition to this equipment, there was a stationary engine, also an oil burner, stationed near the oil tank near the channel end of the sulphur plant, which made the steam heat up the oil so that it would run to the boilers more easily, the steam forcing the oil through the pipes; that he came on the premises September 30, 1920, about 5:30 or 5:40 p. m.; that the boilers were still warm when he arrived, and that according to his custom he looked to see whether any lights had been left burning at the boilers; that when the boilers got hot they radiated heat; that after the first inspection his duties were to keep watch and put out fires; that on the night of the fire he had made the rounds, and it seemed that everything was all right; that the wind was up, blowing a regular gale all night; that he was down at the foot of the stairs at the bins when he looked out of the window and saw that there was a fire; that he then went to the sulphur bins, found a place in the sulphur on fire, a place longer than 10 feet; that the fire started on the south side, there was a blaze more than 10 feet; that he had no communication with the fire department, did not have a fire alarm, and that he hallooed to the fellow at pier 35 to turn in the alarm; that the fire department got there in about 30 or 40 minutes and laid the hose across the railroad track, preventing the removal of the cars on adjoining track; that the firemen then turned the water on the concentration shed; that he was there a short while after

the fire department arrived; that the fire was right up against him; that he had two good hose connections with fire apparatus connected with pipe and full force, one on each side; that he could have controlled the fire if he had had anybody to help him, but he could not do it alone. Pier 35 was not on fire when he left there.

Piers 35 and 36 were built in 1901, and were wooden sheds. Pier 36 had a fire wall on the east side of it between it and the sulphur plant, made of concrete. Pier 35 had no such wall, was made almost exclusively of pine lumber, with a graveled roof. That at the sulphur plant there was one bin about 6 feet deep, 65 feet wide, and 600 feet long, along the railroad track paralleling pier 35, also a similar bin paralleling pier 36, and between these two bins was the hoisting machinery, the engine being located in the center. That the sulphur plant was a storage plant primarily, where large quantities of sulphur was placed for shipment. That there was a boiler operated with fuel oil located on the north end of this plant. These piers were owned by the wharf company. The Texas Gulf Sulphur Company acquired and held possession of the space occupied by the sulphur plant through lease executed by the wharf company, which was in force at the time of the fire. That Magill & Co. were doing business in an allocation on September 30, 1920, at pier 35. That at the time of the fire there was unloaded cotton in railroad cars on the tracks in the custody of the wharf company between the sulphur plant and pier 35. That the cars loaded with cotton between the sulphur bins and pier 35 and some other cars with cotton seed cake caught fire before the cotton on pier 35. That these loaded cars were on all three tracks between the sulphur bins and the shed in which plaintiffs' cotton was stored. That Harris Magill & Co. were allocated by the wharf company to pier 23 until August 26, 1920, at which time their allocation was changed to pier 35 for the month of September, 1920.

Witness Samuel Potter testified that he was engineer and superintendent of the Texas Gulf Sulphur Company, and had been employed at the sulphur plant in question since September 1, 1920; that he went to the fire while it was burning; that the whole pier was destroyed; that the fire was on the north end as well as the south, with a 40 to 50 mile gale blowing from the northeast; that while he had been working there he had had occasion to put out small fires on the railroad tracks in the sulphur dust; that the sulphur company had had fires from causes other than from the wheels of engines, for example, the striking of steel on steel, making a spark, which would ignite the dust in suspension.

Dr. Landon C. Moore, as an expert chemist, testified that cotton is one of the most inflammable commodities of merchandise known, one requiring extreme care and protection from fire hazard; that sulphur coming from a mine in liquid form hardens in blocks and of its own accord does not break up into dust, but that, when dropped, the force of the fall or the blow of a hammer will produce dust; that, if this dust is kept in suspension, there is attendant static electricity which will cause an explosion just as wheat and flour dust may induce static electricity and blow up a flour mill.

[1] Did the trial court err in holding that the federal law was applicable by section 400 of the Transportation Act of 1920 (U. S. Comp. St. Ann. Supp. 1923, § 8563)? Prior to the amendments thereto, effected by the Transportation Act of 1920 (41 Stat. L. 474 et seq.), the provisions of the Interstate Commerce Act (section 20, par. 11 [U. S. Comp. St. § 8640a]) controlling the liability of common carriers to shippers for loss or damage to articles in shipment did not relate to or effect commerce with nonadjacent foreign countries, such for example as the shipment in suit originating in one of the states and destined for a nonadjacent foreign country. The provisions of the Act of June 29, 1906 (34 Stat. 584), relating to interstate commerce and adjacent foreign commerce were entirely absent from the original Interstate Commerce Act of 1887 (U. S. Comp. St. § 8563 et seq.), and from all amendments thereto until 1906. It was first incorporated in the Act by the Carmack Amendment of that year 34 Stat. L. 595 (article 8604a, U. S. Comp. Stats. 1918, by West Pub. Co.). For the changes made in this part of the act of 1906, see the Act of March 4, 1915, being the first Cummings Amendment (38 Stat. L. 1197), and the Act of August 9, 1916, being the second Cummings Amendment (39 Stat. L. 441); the first proviso to said section 8604a being in lieu of a different proviso set forth in the first Cummings Amendment. This proviso, as originally enacted in 1915 and later, as amended, we consider immaterial for the purpose of discussion and will therefore consider this paragraph of the statute as if enacted prior to the provisions contained in the amendment of June 29, 1906, and as to all others in 1915.

Prior to the Carmack Amendment of 1906, the Interstate Commerce Act had not attempted to govern the question of liability of carriers for loss or damage to the articles shipped, and the law of the various states governed that question; the state statutes being held applicable to interstate commerce and foreign commerce, and to fix the liabilities of the carrier with respect thereof where same would apply, otherwise the common law would control, provided only the provisions of the state statutes were not an undue burden on interstate commerce or inconsistent with other provisions of the Interstate Commerce Act. Chicago, M. & St. P. Ry. Co. v. Solan,

18 S. Ct. 289, 169 U. S. 133, 42 L. Ed. 688. This was true, though of course Congress had entered the field of interstate commerce in other particulars as evidenced by the many provisions of the Interstate Commerce Act effective prior to 1906.

It is to be noted that the Carmack Amendment applied only to commerce between states, and did not apply to commerce with any foreign country, either adjacent or nonadjacent. Hamlen & Sons v. Ill. C. R. Co. (D. C.) 212 F. 324. But, as changed by the 1915 Cummings Amendment, the section and paragraph applied to transportation, either interstate or to or from any adjacent foreign country. Prior to the Transportation Act of 1920, unquestionably Congress had not entered the field of legislation with reference to the liability of carriers for loss or damage to shipments to or from a nonadjacent foreign country, and, in the absence of action by Congress in this field, the laws of the several states applicable prevailed. Dexter & Carpenter, Inc., v. Davis, Agent (C. C. A.) 281 F. 385, 25 A. L. R. 1173.

The Transportation Act of 1920, which became effective prior to the contract in this suit, amended the Interstate Commerce Act in several particulars, the amendment relied on by appellees being that to section 1, par. 1, of the act. This paragraph, as amended by the Transportation Act of 1920, § 400, reads as follows:

"1. That the provisions of this act shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or

"(c) The transmission of intelligence by wire or wireless;—from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia, or from one place in a territory to another place in the same territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only in so far as such transportation or transmission takes place within the United States."

It is the contention of defendants that this amendment to section 1, par. 1, made applicable the provision of section 20, par. 11, supra, to commerce "to or from a foreign country" irrespective of the question whether such commerce was to or from an adjacent foreign country, and that by virtue of this amendment of 1920 Congress entered the field of determining the liability of carriers engaged in commerce with nonadjacent foreign countries, depriving of all force and effect the laws of the several states, and, with reference to the particular shipment in suit, rendering inapplicable the Texas law on the question of liability of the carrier. This contention was upheld by the trial court.

The result of our investigation has led us to a different conclusion. The logic of the situation is that the 1920 amendment of section 1, par. 1, was not intended to broaden, and did not broaden, the provisions of section 20, par. 11, theretofore in force, because the Transportation Act of 1920 also amended section 20, par. 11, by re-enacting that entire paragraph with the sole change that no proviso was inserted. The provisions of the act of 1920 relating to the question of liability of the carrier for loss and damage were therefore restricted to interstate commerce and commerce with adjacent foreign countries by use of the same re-enacted language that had theretofore prevailed; section 437 of the Transportation Act of 1920 (41 Stat. 494 [U. S. Comp. St. Ann. Supp. 1923, § 8604a]) being as follows:

"Sec. 437. The eleventh paragraph of section 20 of the Interstate Commerce Act is hereby amended by inserting immediately before the first proviso thereof the following: 'Provided, that if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by and under the laws and regulations applicable to transportation by water, and the liability of the initial carrier shall be the same as that of such carrier by water.' "

Whatever the provisions of section 1 defining what carriers are subject to the provisions of the act, the provisions of section 20, par. 11, controlling the question here involved effect a further limitation, for the first phrases of paragraph 11 clearly state that the provisions apply only to such carriers as are "subject to the provisions of this act," and also that are "receiving property for transportation * * * to an adjacent foreign country." In our judgment, this specific provision unquestionably controls the general provision of section 1, par. 1.

This is further demonstrated, moreover, by a comparison of the provisions of section 1, par. 1, of the act of 1920, above quoted, with the provisions of such paragraph theretofore in effect. See section 1 of the original Interstate Commerce Act of 1887.

Since 1887, paragraph 1 of the Interstate Commerce Act has provided that the act shall apply to common carriers engaged in transportation to or from "a foreign country"; notwithstanding this, it is to be noted, the question of the liability of carriers for loss or damage has been uniformly held to be determinable by state laws where applicable thereto. The general provisions of section 1 of 1887 did not affect this result.

The amendment to the Interstate Com-

merce Act by Act of 1906 (34 Stat. 584), the same amendment which added paragraph 11 of section 20 to the act for the first time, re-enacted the original section 1 of the Act of 1887, with the addition of a great many definitions in subsequent paragraphs of the same section, paragraph 1 of section 1 being substantially the same; the important phrase for our purposes, together with its context, being identically the same (34 Stat. L. 584 [U. S. Comp. St. § 8563]):

" * * * And also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country. * * *"

There is no inconsistency between the general provisions of paragraph 1 of the act of 1906 above quoted and the provisions of section 20, par. 11, of the Interstate Commerce Act as passed in 1906 (34 Stat. 593, § 7), for other parts of the Interstate Commerce Act of 1906, as theretofore applied to foreign commerce as effecting liability of carriers was expressly limited to interstate commerce. For example, section 6 of the Interstate Commerce Act as amended by section 2 of Act of 1906, similar to a provision to that effect theretofore in the act, provided:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedule showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established."

This provision for the publishing of rates contained no limitations such as were imposed under paragraph 11 of section 20 as to the sort of commerce that it should affect, the provisions as to the publication of rates applying to all commerce engaged in by carriers as defined in section 1 of the act. Under section 1 of the act and the provisions just quoted, carriers were required to publish their rates and to comply with the through rates as established after publication, as to commerce with foreign countries, whether adjacent or not, as well as to interstate commerce. Texas & N. O. R. Co. v. Sabine Tram Co., 33 S. Ct. 229, 227 U. S. 111, 57 L. Ed. 442.

Though the field of foreign commerce was therefore entered into by the Interstate Commerce Act at the time of its original passage, in some particulars, such as fixation of through rates, the field of determining the liability of carriers for loss or damage had not been entered into, and the general provisions of section 1 of the act re-enacted in 1906 did not affect an entry into that field, though

paragraph 11 of section 20 deals with the liability of carriers in some classes of commerce. Brass v. Texarkana & Ft. S. Ry. Co., 218 S. W. 1040, 110 Tex. 281–285.

When compared, therefore, with the provisions of section 1, par. 1, of the act as it had theretofore been in effect, the amendment of this paragraph as contained in the Transportation Act of 1920 clearly does not operate to extend the more specific provisions of section 20, par. 11, to commerce with nonadjacent foreign countries. The contention of appellees, as specifically pleaded by them, that the Transportation Act of 1920 extended the field of federal law to determine the liability of carriers engaged in commerce with nonadjacent foreign countries cannot, for these reasons, we think, be sustained. To hold otherwise would, in our judgment, be clearly contrary to the rule announced by the Supreme Court in Adams Express Co. v. Croninger, 33 S. Ct. 148, 149, 226 U. S. 491–500 (57 L. Ed. 314, 44 L. R. A. [N. S.] 257) to wit:

"That the constitutional power of Congress to regulate commerce among the states and with foreign nations comprehends power to regulate contracts between the shipper and the carrier of an interstate shipment by defining the liability of the carrier for loss, delay, injury or damage to such property, needs neither argument nor citation of authority. But it is equally well settled that until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular state, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the state. Such regulations would fall within that large class of regulations which it is competent for a state to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the state over such carriers and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, although interstate commerce may be indirectly affected."

We therefore conclude that the Congress has not entered the field of legislation on the liability of carriers as to loss or damage to shipments to nonadjacent foreign countries. This brings us to consider the question whether or not Texas statutes control.

[2] Our courts have followed the common-law rule to the effect that, where there is no statute to the contrary, a carrier may limit its liability to its own line. Railway Co. v. Baird, 12 S. W. 530, 75 Tex. 263; Railway Co. v. Looney, 19 S. W. 1039, 85 Tex. 159, 16 L. R. A. 471, 34 Am. St. Rep. 787; Harris v. Howe, 12 S W. 224, 74 Tex. 537, 5 L. R. A. 777, 15 Am. St. Rep. 862; Houston East & West Texas Ry. Co. v. Inman, Akers & Inman, 134 S. W. 275, 63 Tex. Civ. App. 556. Under these decisions the provisions in a bill of lading limiting the liability of the carrier to its own line is valid, unless there exists a state statute which prohibits the limiting of such liability or makes such a provision invalid.

The plaintiffs relied upon the following

(283 S.W.)

Texas statutes as prohibiting the limitation of such liability as making void the provisions contained in the bill of lading involved in this case, limiting the liability of the common carriers as urged by defendants in bar of the right of plaintiffs to recover, viz.: Articles 708, 731, and 732, Vernon's Sayles' Ann. Civil Statutes 1914, now articles 883, 905, and 906, Revised Civil Statutes 1925.

[3] Article 883 has no application to the shipment from a point within the United States to a nonadjacent foreign country, for two reasons: (1) Because this statute only prohibits the carrier from limiting its liability as it existed at common law. At the common law the carrier was not liable for loss and damage occurring beyond its own line. (2) Said statute, in our judgment, has no application because by its terms it applies only to carriers of merchandise within the state of Texas.

In the case of Missouri Pacific Ry. Co. v. Sherwood, Thompson & Co., 19 S. W. 455, 84 Tex. 125, 17 L. R. A. 643, the Supreme Court, having under consideration a case in which a bill of lading was issued by the defendant railway company, under the terms of which the property was to be transported from Greenville, Tex., to Galveston, Tex., and from Galveston to Liverpool, England, held that article 278, Revised Statutes 1879 (now article 883, Revised Civil Statutes 1925), had no application to a foreign shipment, and in that respect said:

"Does the statute referred to apply to an interstate or foreign shipment? This question has been several times suggested to our Supreme Court, but the disposition of the cases in which it was presented did not require a solution of it. Ryan v. Railway, 65 Tex. 13 [57 Am. Rep. 589]; Railway v. Harris [2 S. W. 574] 67 Tex. 166; Railway v. Mfg. Co. [14 S. W. 785] 79 Tex. 26. We are of opinion that the question must be answered in the negative; that the statute applies to shipments purely domestic, beginning and ending in the state of Texas. Our conclusion is founded upon the language of the statute itself."

[4] It must be apparent that by its terms article 905, supra, applies only to transportation by carriers between points in the state of Texas on a contract of through carriage; for, by giving the provisions of said article 905, viz. "all common carriers in this state over whose transportation lines, or parts thereof, is transported any freight, baggage or other property, received by either of such carriers for shipment * * * between points in this state," that meaning to which it is only susceptible, the construction as contended for by plaintiffs cannot be sustained, for, to do so, would necessarily eliminate the language, "between points in this state," thereby making same without limitation, applicable to other than intrastate shipments.

Article 906 supra, is limited in its operation to the right of persons sustaining damage under bill of lading to elect to sue in this state any one of the connecting carriers, and said article, in giving that right, refers to article 905, and gives such right in reference to "such through transportation over connecting lines as defined in article 905." Houston E. & W. T. Ry. Co. v. Inman, supra; Railway Co. v. Sherwood, supra.

[5] After careful deliberation we have reached the conclusion that the federal law does not control or apply to the transportation of freight from a point within the United States to a nonadjacent foreign country so as to control the common-law right of a carrier to limit its liability to a loss occurring on its own line; and, further, that articles 883, 905, and 906, supra, relied upon by plaintiffs, do not apply to said provisions Nos. 1 and 2, supra, in the bill of lading under investigation, for the reason that the language of such statutes limits their application to purely domestic shipments as defined in the Sherwood Case, supra, and hold that said provisions are valid at common law, and therefore binding upon the immediate parties to said bill of lading and the connecting carriers receiving and transporting said cotton thereunder; it being well settled that, under the common law, a carrier has a right, not only to limit its liability to its own line, but its liability for the destruction of property by fire occasioned through its acts of negligence. Atl. C. R. Co. v. Riverside Mills, 31 S. Ct. 164, 219 U. S. 186, at pages 194, 195, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7.

[6] In reference to the burden of proof on the issue of negligence, this must be considered in the light of the provision contained in the bill of lading limiting defendants' liability as common carriers to damage to or destruction of the property by fire occasioned by the negligence of the common carrier. This provision being valid, and neither the federal nor state law controlling the rights of the parties as to liability on account of this nonadjacent foreign shipment, the common law controls. The property was destroyed by fire. On this being established, then the question arose as to whether or not such destruction was due to the negligence of the common carrier in whose possession the property was at the time of its destruction. The burden on this issue, on proof of the destruction by fire, rested upon the plaintiffs. This doctrine is recognized and applied in the case of Railway Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909, as follows:

"A common carrier assumes all risks except those caused by the act of God and the public enemy. One of the instances always mentioned by the elementary writers of loss by the act of God is the case of loss by flood and storm. Now, when it is shown that the damage resulted from this cause immediately, he is excused. What is to make him liable after this? No question of his negligence arises unless it is made by the other party. It is not necessary for him to prove that the cause was such as

releases him, and then to prove affirmatively that he did not contribute to it. If, after he has excused himself by showing the presence of the overpowering cause, it is charged that his negligence contributed to the loss, the proof of this must come from those who assert or rely upon it."

In the instant case it was established that the property was destroyed by fire. From this fact no presumption of negligence arose against the common carrier in whose possession the property was at the time of such destruction, and, until the plaintiffs should put in motion the question of liability on account of the destruction of the property by asserting the negligence of the one sought to be held responsible therefore, there remained nothing further for such common carrier to do, having freed itself primarily from liability by the introduction of the proof of the destruction of the property by fire, and this situation would change only on the coming in of evidence tending to establish the negligence of such common carrier as being responsible for the fire that destroyed the property.

[7] The carrier, under the provision of the bill limiting liability for damages to or the destruction of the cotton by fire to the acts of negligence of a carrier, occupies the position of a warehouseman in reference to liability for the destruction of property by fire, to wit, only liable in case such destruction of the property is due to the acts of negligence of the warehouseman. Exporters' & Traders' Compress & Warehouse Co. v. Schulze (Tex. Com. App.) 265 S. W. 133.

[8] In disposing of this appeal as to the defendants railway company, the receiver of said railway company, and the wharf company, we think that, in view of the undisputed evidence, it is immaterial whether the burden of proof rests upon the plaintiffs or the defendants, as it is made conclusively to appear from the evidence that neither the railway company, the receiver of said company, nor the wharf company were negligently responsible for the loss and damage by fire—the evidence bearing upon this issue herein set out clearly showing that the railway company promptly and properly transported plaintiff's cotton to Galveston, Tex., and there delivered it to the wharf company; that the tracks of the railway company did not reach the pier occupied by Harris Magill & Co.; that, before the railway company accepted this cotton for shipment, plaintiffs prepared a bill of lading showing on its face that said cotton was to be taken to Galveston for delivery to Harris Magill & Co., steamship agents; that plaintiffs advised the railway company that they had a contract with Harris Magill & Co. for space upon a boat for transportation of the cotton to Manchester, England; that this information was verified by telegraphic communication between the railway company and Harris Magill & Co.

Therefore it was the plain duty of the railway company, under said bill of lading, to transport plaintiffs' cotton to Galveston, and to deliver it to connecting carrier, and direct the connecting carrier receiving said cotton from it to deliver same to Harris Magill & Co., who were then occupying a part of pier 35. The evidence further reveals that the railway company or its receiver had nothing to do with starting the fire, and were not in position to do anything to prevent the fire from spreading to and destroying plaintiffs' cotton. In other words, the evidence clearly absolves the railway company from any act of omission or commission that could have caused or contributed to cause plaintiffs' loss. The wharf company likewise performed its full measure of duty under the contract of shipment under which plaintiffs' cotton moved for transportation. The car of cotton when received by it on the 17th day of September, 1920, from the railway company had attached to it a card directing that the cotton be carried and delivered to Harris Magill & Co., which directions were complied with on September 24, 1920, the cotton being unloaded and placed upon the premises by Harris Magill & Co. at pier 35; said wharf company then receiving from Harris Magill & Co. a receipt therefor.

The fire occurred at 1 o'clock a. m., September 30, 1920, which the undisputed evidence shows originated in the plant of the Texas Gulf Sulphur Company, which had leased wharf space from the wharf company adjoining pier 35. The wharf company had no alternative but to deliver plaintiff's cotton as above stated to Magill & Co. If the wharf company had delivered said cotton at some other point, and, while the cotton was located at such other point, it had been destroyed by fire, not due to the negligence of the wharf company, the wharf company nevertheless would have been guilty of conversion of the cotton because it delivered it contrary to the contract between the shipper and the carrier. We therefore hold that the court properly instructed the jury to return a verdict in favor of the defendants Missouri, Kansas & Texas Railway Company of Texas, C. E. Schaff, receiver of said railway company, and the Galveston Wharf Company.

As to the United States Shipping Board Emergency Fleet Corporation, we are of the opinion, after careful review of the entire statement of facts, that same reveals sufficient testimony on the question of actionable negligence on the part of the Fleet Corporation to require the submission of same for the determination of the jury. This, we think, should be apparent from the evidence bearing upon that issue collated herein, which, in view of the fact that this cause will be reversed and remanded for further proceedings in the trial court, we will refrain from discussing for the purpose of showing its probative strength and relevancy, as to that issue.

Therefore this cause should be reversed and remanded as to said Fleet Corporation, and affirmed as to the other defendants, and it is so ordered.

Affirmed in part, and reversed and remanded in part.